## ROYAL A. B. MILLS

*v.*

## HENRY GRAVES.

| 38 | 455 |
| 137 | 34 |
| 38 | 455 |
| 153 | 515 |
| 38 | 455 |
| 161 | 356 |
| 38 | 455 |
| 176 | 214 |
| 38 | 455 |
| 95a¹⁰653 | |
| 38 | 455 |
| 110a ⁴454 | |
| 110a ⁴456 | |
| 38 | 455 |
| 209 | 480 |

1. ESTOPPELS *in pais—when they arise, etc.* An estoppel is defined to be an impediment or bar to the assertion of a right of action, arising by a man's own act, or where he is forbidden by law to speak against his own act.

2. It extends to and binds privies in blood, privies in estate and privies in law.

3. Every estoppel, to be binding, ought to be reciprocal, and should bind both parties.

4. And because it concludes a man from alleging the truth, it must be certain, to every intent, and must not be taken by argument or inference. Every estoppel ought to be a precise affirmation of that which creates the estoppel, and not by way of recital.

5. So, mere loose expressions, inadvertently made, in ignorance of the party's rights, or declarations ambiguous in their character, can not create a bar to the assertion of the truth.

6. And declarations which were not acted upon, can never operate as an estoppel.

7. And, generally, when the avenues of information are equally open to both parties, there will be no bar.

8. So where the owner of land has his title upon record, or is in the actual occupancy of the land, he thereby gives all the information of his claim that is required, unless specially interrogated respecting it.

9. In this case ejectment was brought to recover a strip of land lying between and adjoining two parcels to which defendant had title. Both parties claimed title from a common source. The plaintiff's title was of record. The deeds constituting defendant's chain of title described the land

conveyed by metes and bounds, excluding the intervening strip in controversy. The defendant resisted the recovery solely upon the ground that the original owner, the common source of title, had declared he had no remaining interest in the land, and that the defendant was the owner thereof, insisting that thereby he and his grantees were estopped from afterwards asserting title. But there was held to be no estoppel.

10. Estoppels *in pais*, having reference to real estate, can not be made available in a court of law; they have been uniformly enforced in courts of equity, and usually by injunction.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

This was an action of ejectment instituted in the court below by Royal A. B. Mills against Henry Graves, to recover that part of the N. E. quarter of Sec. 34, 39, N. R. 14, " beginning at a point on Lake Michigan, on the north line of a strip of said quarter conveyed by Samuel Ellis and Lydia, his wife, to William Jones, by deed, dated 15th August, 1835, running thence west on the said north line of said strip, to the west line of said quarter section; thence north on the west line of said quarter section, one chain and twenty-eight links; thence east on a line parallel to the south line of the strip herein described, to Lake Michigan; thence southerly on said Lake, to the place of beginning."

Both parties claim from Samuel Ellis as a common source of title.

It seems that on the 5th day of June, 1835, Samuel Ellis and wife conveyed to E. K. Hubbard the north-east quarter section mentioned, " excepting out of the same, a certain strip of land, described and known as follows, viz : Beginning at lake shore, running west through a point eight rods south of the south-east corner of the house now occupied by the said Ellis, 29 chains 5 links; thence north on old line, 13 chains 25 links; thence east 24 chains 80 links, to lake shore; thence on an angle 22° 45 min., to place of beginning, containing thirty-six acres, 0234-1000 per survey, by L. G. Curtis, for G. W. Snow."

On the 15th of August following, Ellis and wife conveyed to William Jones, another portion of the same quarter section, beginning on the bank of Lake Michigan, Sec. 34, 39, 14; "thence west 2 chains south of Samuel Ellis' house, in a true line, to a line running north and south through said section, in the centre, being 32 chains 49 links; thence north on said line, 11 chains, 97 links; thence east to Lake Michigan, 27 chains, 70 links; thence along Lake shore, 23½° east, 13 chains 1 link, to place of beginning, containing 36 17-100 acres."

These conveyances being made, there was left between the two parcels therein described, a strip of land, one chain and twenty-eight links in width, extending from Lake Michigan west through the quarter section, still belonging to Samuel Ellis, and that strip of land is the one in controversy in this suit.

On the 29th of June, 1852, Ellis and wife executed to Samuel R. Haven a quit claim deed for this last mentioned parcel of land, and the plaintiff produced a regular chain of conveyances from Haven to himself.

The defendant, Graves, exhibited title through several mesne conveyances from Hubbard and Jones, but no deed was shown from Samuel Ellis or any other person, for the land in controversy, except that to Haven, and the others, under which the plaintiff claims. The defendant resists the plaintiff's right of recovery solely upon the ground of certain declarations of Ellis, which, he contends, operate to estop him and his grantees from claiming title to the premises in controversy. The following testimony will show the grounds of the alleged estoppel:

*Mrs. Johnson*, a daughter of Samuel Ellis, testified: Am acquainted with tract called Cottage Grove Tract. My father first moved on it in 1832. He moved on that part now owned by Graves, in 1835 or 1836. I remember the time. Lived there two or three years. The first he sold of it was to E. K. Hubbard, I think. At the time of that sale, my father retained possession of the north part of the 36 acres. He retained possession of 36 acres. He afterwards sold the 36 acres to

30—38TH ILL.

Mr. Jones. Gave possession of same in 1837, I think. Removed to near Langley's place. The place on which he lived, is known as Ellis' Addition. I remember Augustus Garrett, and of his purchasing lands my father had sold. At that time father lived at same place he had moved to. He died October, 1853. He knew Garrett purchased the lands. Don't remember whether Garrett fenced the lands. Remember seeing fence around the Cottage Grove piece, or that north of it. Saw it a great while ago. Knew about the time Graves went into possession of the premises. Some of it was fenced before he went in. Think father knew of Graves purchasing them. Have heard him say so, that he was glad he was going to have Graves for a neighbor. Father and Graves saw each other every few days, were very friendly.

*Cross-examination*: Am near 47 years old. At the time my father left, he had fenced in the S. W. side of the property he sold. Think that not all the quarter section was fenced. Fence was below the south line. The house faced west. It was a small shanty, one room in it. It was not fenced towards the north part of the section, all open prairie. I don't know how much was sold the first time, whether 60 or 65 acres, but they reserved 36 acres for a residence. Heard my father say that. Think we moved away in '37 or '38. Father had fenced some of the north part. No inclosure around all of it. By giving possession, I mean the giving the deed, that is all the possession I mean.

*Re-examination:* E. K. Hubbard went into possession after our moving away. The sale was about that time.

*Lyman Ellis*, son of Samuel Ellis, testified: Remember the time father left Cottage premises. Can't tell who went into possession. Augustus Garrett purchased. Suppose father knew it. Don't know certainly. Don't know year it was fenced. Know it was done after Garrett got it, with a picket fence. Think it was around the whole piece, the Cottage Grove part that lying north of it. Also, on each side of the road. Don't know how many years it was fenced. Think

some was standing 2 or 3 years ago around some part of it. Don't remember the year Dexter Graves went into possession. It was fenced up when he went there. Father lived then on next lot. Possibly over 70 rods. Lived there till he died. Lorin and Henry Graves have occupied the premises since Dexter Graves' death. Father was in the habit of going to Cottage House, sometimes three or four times a week, at others once or twice. Never heard him talk with Graves about the purchase. Father was there often at time Graves was sick. Dexter Graves did not stop there but one season. Don't know as father was at Cottage House except when Graves was sick. He had to come by there every time he come to Chicago. Never heard father claim the premises, that is after he had sold it, or after giving the possession.

*Cross-examination :* Don't know of father claiming land after selling to Hubbard & Jones. No person living on premises before he left the house. Could not say that any part was fenced, except a little west of the Cottage. Don't know of any more.

*Re-examination :* The fencing is not the fence that Garrett built; Garrett built that soon after father sold to Jones, within a year after. He fenced with picket fence. It remained there wholly probably two or three years.

*Frederick Howe* sworn : Came to this country in 1835. First saw S. Ellis on Cottage property in that year. Lorin Graves owns it now. Ellis was there two or three years after I came, then removed directly south of Douglas place. I used to see him very frequently. I knew Garrett went into those premises. He built a fence around the whole lot. Can not state the time. It was around whole lot in which Cottage Grove House was. Took in what is the camp ground now. It was picket fence, some may be standing now. Was acquainted with Dexter Graves. First knew him in 1835. Knew he and Ellis were acquainted. Remember that he purchased the premises of Garrett. He took all the land inclosed. In going to city to trade Ellis had to go by there.

*Interrogatory :* Did you hear Ellis say anything previous to 1852, about having sold that property and given up possession, if so, state what it was, and when?

*Answer :* I can't state the date, but the first I knew was when Dexter Graves died and Lorin Graves came to me and wanted me to see Ellis, that some one had been after the old man and got a quit claim deed of Ellis for a strip through the Cottage property. He took me down to Ellis. He says I have no interest in that property. It belongs to Graves. I refused to give any quit claim deed. I would not do anything to injure the boys. I sold it long previously. It was soon after Graves died, I think. After Lorin's death, Henry came to me—another muss about it. Got me to go to see the old man. Think he told me same story, they had no interest and refused to give a quit claim. Dexter Graves died in 1845, Lorin three or four years after. Have done great deal of business for Graves.

*T. Doty* testified : Came to Chicago July, 1837. Knew Graves, Ellis and Garrett. Garrett owned premises and improved by fencing. Was fenced near old house. Not as much as is now called Cottage property. Not as far as the Graves property runs now. It runs some way into Camp Douglas. Roads and streets have changed. Fence came to old city limits. Some not under fence now. Can't state time when Graves went in. Know the fact. Ellis often came to city. Graves kept Cottage Grove premises under fence. Are buildings on same.

*Cross-examination :* Do not know location of strip in controversy.

Deposition of *Stephen A. Douglas :* Knew Samuel Ellis. Knew tract known as Graves' tract. It is where Henry Graves resides, between 58 and 60 acres off the N. E. ¼ of sec. 34, 39, 14, and lying immediately north of the tract owned by me, called the Cottage Grove tract.

*Int.* Is any portion of the Cottage Grove tract situated on said N. E. ¼ ?

*Ans.* The tract owned by myself and the Graves tract comprise all said quarter section, as I understand.

When I concluded to purchase, in 1849, I called on Henry and Lorin Graves to point out to me their south line, that I might know my north boundary line. Unable to tell precisely, they referred me to Ellis, who was then passing by. I made the inquiry of Ellis, and he went with me and pointed out the spot where the old house stood, and pointed out what he said was the line. He said he had sold all north of that line, and that H. and L. Graves were then the owners. That he had also sold all south, but could not state present owners. The line pointed out by Ellis is the same on which I built my part of the fence. Ellis mentioned William Jones as one of the parties to whom he had sold a portion of said tract, and I think E. K. Hubbard or Augustus Garrett as the purchasers of the residue. Ellis said distinctly that Henry and Lorin Graves were the owners of all that part of said quarter section north of the line he pointed out, and that it contained between 58 and 60 acres, a portion of which was then inclosed by a fence.

Ellis disclaimed any interest in said tract.

To all which testimony of witnesses and in deposition so far as it relates to the declarations of said Ellis the plaintiff objected, for irrelevancy, and for that it seeks to establish title to land by parol as against title evidenced by deeds of record, and asked the same ruled out. Court overruled the objections, admitted the evidence and plaintiff excepted.

The jury returned a verdict for the defendant; a motion for a new trial was overruled and judgment entered upon the verdict.

The plaintiff brings the case to this court by appeal, and presents the question, whether he is estopped from asserting his title by reason of the acts and declarations of Ellis.

Mr. J. S. PAGE, for the appellant.

The only defense relied upon is an estoppel *in pais.* An estoppel is founded upon the idea of fraud, or gross negligence amounting to fraud. But certain elements are necessary to warrant it.

1st. That the acts or admissions were designed to influence and did influence the conduct of another. 1 Story's Eq. 386; *Devereux* v. *Bengwyn,* 5 Iredell, 351; *Pickard* v. *Sears,* 6 Adolph, & E, 474; *Dezell* v. *Odell,* 3 Hill, 225; *Lawrence* v. *Brown,* 1 Seldon, 401; *Duel* v. *Bear River Co.,* 5 Cal. 85; *McCune* v. *McMichael,* 29 Geo. 312; *Otis* v. *Sill,* 8 Barb. 108; *Titus* v. *Morse,* 4 Maine, 348; *Dyer* v. *Cady,* 20 Conn. 568; *Taylor* v. *Ely,* 25 Conn. 258; *Freeman* v. *Cook,* 2 Exch. 654; *Roe* v. *Gerome,* 18 Conn. 138; *Whitaker* v. *Williams,* 20 Conn. 98; *Patterson* v. *Lytle,* 11 Penn. 56; *Rogers* v. *Farwell,* 9 Barb. 618; *Hunley* v. *Hunley,* 15 Ala. 105; *Carter* v. *Darby, ib.* 696; *Brewer* v. *Brewer,* 19 *ib.* 490; *Letcher* v. *Morrison,* 27 Ill. 214; *Thomas* v. *Bowman,* 29 Ill. 429; 2 Washburne (2d Ed.) 460.

2d. Another necessary element of an equitable estoppel is, that the party should have been fully apprised of his rights at the time of his admissions or conduct by which he is sought to be estopped. 1 Story's Eq. 386; *Watkins* v. *Peck,* 13 N. H. 373; *Morris* v. *Moore,* 11 Humph. 433; *Storrs* v. *Barker,* 6 Johns. Ch. 167; *McAfferty* v. *Conover,* 7 Ohio, 105; *Copeland* v. *Copeland,* 28 Me. 540; *Tilghman* v. *West,* 9 Iredell, 165; *Buckingham* v. *Smith,* 10 Ohio, 299; *Royston* v. *Howe,* 15 Ala. 309; *Peper* v *Gilmore,* 49 Me. 153; *Galting* v. *Rodman,* 6 Ind. 292; *Conith* v. *Moltz,* 10 Penn. 531.

3d. There is also another class of cases, which hold that no estoppel will arise in absence of actual fraud, unless the purchaser was destitute, not only of all actual knowledge of the true state of the title, but of the means of acquiring knowledge. *Bigelow* v. *Topliff,* 25 Vermont, 273; *Custer* v. *Champion,* 8 Conn. 554. For under these circumstances, both parties must be regarded as equally negligent. *Gray* v. *Bartlett,* 20 Pick. 186. See also, *Ferris* v. *Coover,* 10 Cal

631; *Curt* v. *Jack,* 3 Watts, 240; *Boggs* v. *Merced Co.,* 14 Cal. 368; Story's Eq. 391; *Brewer* v. *Boston & W. R. Co.,* 5 Met. 479; *Knouff* v. *Thompson,* 16 Penn. 364; *Woods* v. *Wilson,* 37 *ib.* 384; *Couseth* v. *Woltz,* 10 *ib.* 531; *Hill* v. *Eply,* 31 *ib.* 331; *Tongue's Lessee* v. *Nutwell,* 17 Md. 212.

4th. So far I have considered this question as if in equity. Can this defense be set up at law? Formerly there would have been no question. In Pennsylvania, Maine and New Hampshire, and perhaps one or two other States, these defenses have been allowed at law, but the weight of authority is the other way. In *Heard* v. *Hall,* 16 Pick. 460, (A. D. 1835,) the court say, "it does not appear to have been adopted or considered as a rule at common law, excepting in the State of Pennsylvania, where the courts having no equity jurisprudence," &c.

In *Swick* v. *Sears,* 1 Hill, 17, which was ejectment, and estoppel *in pais* attempted, the court say "if the defendant is to rely upon this point of the case he must go into equity." *Deleplaine* v *Hitchcock,* 6 Hill, 17; *Brewer* v. *Boston & W. R. R.,* 5 Met. 484; *West* v. *Tilgham,* 9 Ird, 165; *Sosser* v. *Jones,* 3 Ird. Eq. 19; *Dunley* v. *Rector,* 5 Eng. 211.

But the law in this State has been settled by this court in the recent case of *Wales* v. *Bogue,* 31 Ill. 468, where the court say "there is no rule of practice better settled than that an equitable title forms no bar to a recovery in ejectment."

Mr. JAMES L. STARK, Jr., for appellee, contended that the matters proven would create an estoppel in favor of the defendant, and cited from 2 Washb. on Real Property, 462.

"It may be stated as a legal proposition, that if one were induced to purchase an estate by acts or representations of another, designed to influence his conduct, and creating a reasonable belief on his part, under which he acts, that he is thereby acquiring a title to the same, the party who should thus have influenced him, would be estopped to set up his own title existing at the time of the purchase, against that of the

purchaser.   It is enough that the latter has been misled by the acts or declarations of the former, if the same were intended to influence, and did influence, his conduct, although no fraud was designed."

Citing also, 16 N. Hampshire R. 201, 206; 6 B. Monroe, 113; 8 B. Monroe, 542; *Middletown Bank* v. *Jerome*, 18 Conn. R. 450; *Brown* v. *Wheeler*, 17 Conn. R. 345; *Corbett* v. *Worcross*, 35 N. H. 99; 24 Vt. 64; 28 Vt. 128; Smith's Leading Cases. 641, 650, and cases cited; *Pramly* v. *Sperry*, 28 Maine, 528; 40 Maine, 348.

Again, "the obligation created by estoppel, not only binds the party making it, but all persons privy to him.   2 Washburne on Real Property, 470; *Douglas* v. *Scott*, 5 Ohio R. 199.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

This was an action of ejectment, for the recovery of a strip of land in the N. E. qr. of sec. 34, T. 39 N. R. 4 E.   Both parties claim from Samuel Ellis as a common source of title. Plaintiff produced a regular connected chain of title to the premises in controversy.   And a recovery was opposed upon the ground that Ellis and those claiming under him, were estopped by matter *in pais* from asserting title.   The doctrine of estoppels *in pais*, at this day, seems to be that they are equitable and not legal, when they relate to real property.   An estoppel is defined to be an impediment or bar to the assertion of a right of action arising by a man's own act, or where he is forbidden by law to speak against his own act.   It extends to and binds privies in blood, privies in estate and privies in law. Co. Litt. 352, A.   Lord COKE says, that every estoppel, to be binding, ought to be reciprocal, and should bind both parties, and for that reason a stranger shall neither take advantage of, nor be bound by, an estoppel.   That because it concludes a man from alleging the truth it must be certain, to every intent, and must not be taken by argument or inference.   That every

estoppel ought to be a precise affirmation of that which creates the estoppel, and not by way of recital.  *Ib.*

It then follows from this rule, that mere loose expressions inadvertently made, in ignorance of the party's rights, or declarations ambiguous in their character, can not create a bar to the assertion of the truth.  And it is a well recognized rule that declarations, which were not acted upon, can never operate as an estoppel.  They are said to be odious to the law, and it is for the reason that they prevent the assertion of the truth. They are only sanctioned to prevent the perpetration of fraud and to effectuate justice.  When a party stands by and sees another acting to his injury, and the owner declares that he has no claim, equity will not permit him afterwards to assert his title to the injury of the person he has thus misled.  And cases may be found where mere silence, by the true owner being present and failing to assert his right, when he sees a person purchasing the property, has been held to create an estoppel.  But to operate as a bar to the assertion of his right, the acts of the owner must contribute to the injury of the person relying upon the bar, before he can be estopped.

Mere declarations to strangers, unless communicated to, and acted upon by, the party will not operate as an estoppel.  And, generally, when the avenues of information are equally open to both parties there will be no bar.  Nor is the party holding the title bound to seek the other and inform him of his rights, when he is in no default.  The owner of land having his title duly recorded, has given all the information to the purchaser which the law requires.  So, a person in the actual occupancy of his land, gives thereby all the information of his claim which is required, unless specially interrogated.  In case, however, he was not in possession, or his title was not recorded, it would be different.

In the case at bar, plaintiff's title was on record, and it was the duty of persons desiring to purchase, to examine the title of record, and the presumption is that such was the case.  If so, they were fully informed that Samuel Ellis or any person

through whom defendant derives title, never attempted to convey this strip of land. Nor does it appear that any person through whom defendant's title passed, was ever misled, or induced to believe, that they were acquiring title to these premises at the time they purchased. They all purchased by metes and bounds, and acquired all the land they purchased. And by what pretense it can be insisted that those claiming adversely to plaintiff have ever been wronged by any declarations made by Samuel Ellis, is beyond our comprehension. When they have no conveyance for the land, have never contracted for its purchase, and never paid anything for it, we are unable to perceive how any fraud has been committed by Ellis in his life time. It is true, that this strip adjoins the land purchased by defendant in error, but that does not give him title even if Samuel Ellis did say to some person that he had no claim to the land. Titles to land are not so fleeting as to be acquired or lost with such facility. There is more stability in our tenures, than warrants a divestiture by such slight and trifling acts by the owner. That requires more solemn and deliberate action.

Had the acts which were proved, constituted an estoppel, it would have been simply an equitable right, incapable of assertion in a court of law. *Wales* v. *Bogue*, 31 Ill. 464. There can be no pretense that mere oral declarations can ever transfer the legal title, and equitable title and demands are not cognizable in a court of law. Even if this were such an estoppel as defendant claims, the legal title is in Ellis' heirs or grantees. After a careful examination of the adjudged cases, we are unable to find that such estoppels can be made available in a court of law. Estoppels relating to real estate, so far as we can find, have been uniformly enforced in courts of equity, and usually by injunction. And this is manifestly in accordance with the analogies of the law. Legal rights of action or defense are allowed in courts of law, whilst those which are equitable are alone cognizable in a court of equity. Equitable titles created by parol, and not within the statute of frauds, can

only be enforced in a court of chancery. If such an estoppel operates to transfer title, or to produce that effect, it is upon the principle that an equitable estate has been created and not that the legal title has been transferred.

In some cases verbal sales of land are taken out of the statute of frauds, for the purpose of preventing the statute from being used for the perpetration of the fraud it was designed to prevent. So of estoppels relating to the title to land, if the owner does by parol that which operates as a fraud and injustice upon another dealing with the property, equity will not permit him to consummate his fraud by the assertion of his legal title. In *Cochrane* v. *Harrow*, 22 Ill. 345, this court held, that where a person stands by and permits another to purchase land to which he had title and failed to make it known, such a failure to assert his rights constituted an equitable estoppel. But an estoppel can never be allowed where it would itself perpetrate fraud, work injustice, or fail to protect the innocent. In those States, however, where equitable rights are regarded and equitable relief administered in their courts of law, estoppels are allowed to be asserted in such courts, and their decisions would not apply to our system of jurisprudence.

The judgment of the court below must be reversed and the cause remanded.

*Judgment reversed.*