Tate v. Tate.

## J. C. TATE *et ux. v.* MARTHA F. TATE *et al.*

### (*Jackson.*    April Term, 1912.)

1. WILLS.   Giving whole estate to husband for life, and at his
   death to children of testatrix or the issue of any child previ-
   ously dying, gives remainder to children or issue as a class.
A will giving all the property of the testatrix to her husband
   for life, and at his death to be equally divided between her
   children, share and share alike, the issue of any child, dying
   before said period, to take the share of the deceased parent,
   gave such remainder estate to the children of the testatrix, or
   their issue, as a class; and where one of such children died
   after the death of the testatrix, but before the life tenant,
   unmarried and without issue, the other surviving child, living
   at the death of the life tenant, took the whole remainder estate.
   (*Post, pp.* 172-199.)

   Cases cited, reviewed, and approved:   Frierson v. Van Buren,
      7 Yerg., 606; Deadrick v. Armour, 10 Humph., 588, 600, 601;
      Satterfield v. Mayes, 11 Humph., 58; Womack v. Smith, 11
      Humph., 478, 479; Morton v. Morton, 2 Swan, 318; Fulkerson
      v. Bullard, 3 Sneed, 260; Beasley v. Jenkins, 2 Head, 191, 192;
      Rogers v. Rogers, 2 Head, 660; Parrish v. Groomes, 1 Tenn.
      Chy., 581, 583; Connell v. McKenna, 2 Tenn. Cas., 190; Jackson
      v. Everett, 3 Tenn. Cas., 881; Land Co. v. Hill, 87 Tenn., 589,
      595, 596; Blass v. Helms, 93 Tenn., 166; Forrest v. Porch, 100
      Tenn., 391; Nichols v. Guthrie, 109 Tenn., 535; Sanders v.
      Byrom, 112 Tenn., 472, 477, 478, 479.

   Cases cited, reviewed, distinguished, and approved:   Cathey v.
      Cathey, 9 Humph., 470; Ivey v. Satterfield, 11 Humph., 58; Lock-
      wood v. Nye, 2 Swan, 519; Bridgewater v. Gordon, 2 Sneed,
      5; Ward v. Saunders, 3 Sneed, 387; Harris v. Alderson, 4 Sneed,
      250; Petty v. Moore, 5 Sneed, 126; Alexander v. Walch, 3 Head,
      493; McClung v. McMillan, 1 Heisk., 655; Puryear v. Edmond-

Tate v. Tate.

son, 4 Heisk., 43; Green v. Davidson, 4 Bax., 488; Whitman v. Young, 1 Tenn. Chy., 586; Allen v. Allen, 2 Tenn. Chy., 28; Davis v. Goforth, 1 Lea, 31; Elkins v. Carsey, 3 Tenn. Cas., 292; Owens v. Dunn, 85 Tenn., 131; Balch v. Johnson, 106 Tenn., 249; Smith v. Smith, 108 Tenn., 21.

2. **ESTOPPEL.** Contingent devisee in remainder is not estopped by mistaken construction of will in bills, and conveyances before the estate is vested and the will is construed by court, when.

Where the complainant, under the proper construction of her mother's will, is entitled to the entire remainder estate in her mother's property, to the exclusion of those claiming under her deceased sister dying before the death of the life tenant, she is not estopped to claim that interest by the fact that she filed bills in chancery and joined in trust deeds in which she, erroneously and mistakenly, recognized an equal vested interest in the sister, when neither of them had a vested interest, and both only had contingent interests depending upon their survival of their father as life tenant, because such recognition was made under mistake as to the effect of the will, which was open to examination and construction by any one. (*Post, pp.* 199-212.)

3. **SAME.** Sworn statements of facts operate as estoppel, but statement of conclusion of law does not so operate, when.

Where one, upon oath, in a pleading, deposition, or oral testimony, states a given fact as true, he will not be permitted to deny that fact in a subsequent litigation, though the parties be different, unless the statements were made inconsiderately, by mistake, or without full knowledge of the facts; but the estoppel does not apply to mere conclusions of law upon undisputed facts. (*Post, pp.* 212-214.)

Cases cited and approved: Hamilton v. Zimmerman, 5 Sneed, 39; Cooley v. Steele, 2 Head, 605; Stillman v. Stillman, 7 Bax., 169, 175; Stephenson v. Walker, 8 Bax., 289; Seay v. Ferguson, 1 Tenn. Chy., 287; Nelson v. Claybrooke, 4 Lea, 687, 692; Chilton v. Scruggs, 5 Lea, 308; McEwen v. Jenks, 6 Lea, 289; Watterson

Tate v. Tate.

v. Lyons, 9 Lea, 566; Smith v. Fowler, 12 Lea, 163; Allen v. Westbrooke, 16 Lea, 251, 255, 256; McCoy v. Pierce, 1 Tenn. Cas., 87; Murrell v. Watson, 2 Tenn. Chy., 244; Verhine v. Ragsdale, 96 Tenn., 532; McLemore v. Railroad, 111 Tenn., 639, 666, 667; Grier v. Canada, 119 Tenn., 17; Barnes v. Brown, 1 Tenn. Chy. App., 726.

4. SAME. By deed cannot be claimed except by parties or privies thereto.

No one can claim an estoppel by deed, who is not either a party or privy thereto. (*Post, p.* 214.)

5. SAME. Not operative unless other party justifiably relied on statements and had no equal opportunity of ascertaining the truth.

Estoppel cannot be operative against any one, unless the statement complained of was made under such circumstances as justified the other party in relying on it, and unless it was relied on, and then it will not be binding where such other party had equal opportunity of ascertaining the truth of the representation. (*Post, pp.* 214-219.)

Case cited and approved: Parkey v. Ramsey, 111 Tenn., 302, citing and approving Morris v. Moore, 11 Humph., 433-435; Moses v. Sanford, 2 Lea, 659; Askins v. Coe, 12 Lea, 672; Collins v. Williams, 98 Tenn., 525; Coal Co. v. McDowell, 100 Tenn., 570; Crabtree v. Bank, 108 Tenn., 483, 491; Burgess v. Seligman, 107 U. S., 20; Estis v. Jackson, 111 N. C., 145; Mills v. Graves, 38 Ill., 455; Holcomb v. Boynton, 151 Ill., 294.

6. QUIETING TITLE. Reimbursement by complainant to defendants for benefits received in discharging tax liens and other liens.

In quieting complainant's title to land against claims arising under deeds of trust given by a sister, who, through a mistaken construction of their mother's will, was supposed to have a vested undivided half interest in remainder in the land, complainant will be required to reimburse defendants, so far as the money, lent and attempted to be secured by such deeds of trust,

was used to redeem the land from tax sales and liens and other liens. (*Post, pp.* 219-221.)

Cases cited and approved: Trousdale v. Trousdale, 6 Lea, 161; Caldwell v. Palmer, 6 Lea, 652; Howard v. Wheatley, 15 Lea, 607, 616.

## FROM SHELBY.

Appeal from the Chancery Court of Shelby County (Part II).—FRANCIS FENTRESS, Chancellor.

WRIGHT & WRIGHT, PERCY FINLAY, and FITZHUGH & BIGGS, for complainants.

McKELLAR & KYSER, RANDOLPH & RANDOLPH, W. G. CAVETT, and W. P. METCALF, guardian *ad litem,* for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

Complainant Martha H. Tate is the daughter of Mrs. Mary H. Hillsman, who died, August 22, 1883, the owner of a large estate in realty. Mrs. Hillsman left surviving her, also another daughter, Mary T. Hillsman, who never married, but died on June 15, 1905. She also left surviving her her husband, John T. Hillsman, who died November 21, 1909. On the date last mentioned complainant Martha H. Tate was the only surviving child of her mother, and no issue was left by any deceased child. Prior to her death Mrs. Hillsman made and published her last will and testament, two items of which are as follows:

"Item II.  My entire estate, real and personal and mixed, and wherever situate, I give, devise and bequeath to my husband John T. Hillsman, his heirs and assigns, in fee simple, in trust, nevertheless, to hold the same for his own use, benefit and behoof, during his natural life, and at his death to be equally divided between my children, share and share alike, and in fee, the issue of any child that may have died to represent and take the share of the deceased parent.

"Item III.  For the purpose of removing any mortgage, incumbrance or lien of any character, whatever, that may be upon my estate or any part thereof, at the time of my death, I hereby invest my said husband, John T. Hillsman, with power to sell my real estate or any part thereof, and I invest him with the like power to sell and convey my real estate or any part thereof for the purpose of investing the proceeds of sale in other property, such other property to be held upon the trusts above declared; that is to say, for himself during his life, and at his death to be equally divided amongst my children or their representatives, and the like power of sale is hereby conferred upon my said husband as to any property acquired by a reinvestment of the proceeds of sale; the substituted or acquired property in all instances to be held on the same trusts and subject to the same powers as my original estate.  But the said power of sale, either to pay debts or for the purposes of reinvestment, shall not be exercised except by the consent and concurrence of B. M. Estes, of Memphis, Tennessee, such consent and concurrence to be signified

by his joining in the deed of conveyance.  It is my further will that if the said Estes should die in the lifetime of my husband, the chancery court of Shelby county or any court succeeding it may, on the petition of any person interested in my estate, appoint a substitute for him, whose consent and concurrence, to be evidenced in the manner aforesaid, shall be necessary to an execution of said power of sale."

The chief question in the case arises upon the construction of item number 2.

It is insisted in behalf of complainant that Mrs. Hillsman devised her estate to her children as a class, and that complainant Martha H. having survived her sister, the latter having never married, and consequently having left no issue, she is the owner in fee of all of the propery devised by her mother.  Defendant's contention is that each of Mrs. Hillsman's children took a vested estate in fee in remainder, defeasible, however, upon either dying prior to the death of their father and leaving a child or children, in which latter event the fee, according to defendants' claim, would go to such child or children left surviving either of the two children of the testatrix.

Stated shortly, the controversy is whether item 2 falls within the class doctrine as known and administered in this State.

The latest case upon the subject in our reports is that of *Sanders* v. *Byrom,* 112 Tenn., 472, 79 S. W., 1028.  In that decision the cases in this State are collected and classified.  First, those wherein the class doctrine was

Tate v. Tate.

held to apply; secondly, those in which it was held not to apply; and, thirdly, two cases which seems to be out of line with the current of authority.

It is perceived that under item 2 the estate is given to the husband, John T. Hillsman, for life, "and at his death to be equally divided between my children, share and share alike, and in fee, the issue of any child that may have died to represent and take the share of the deceased parent."

It is also seen under the third item power is given to John T. Hillsman to sell the real estate for the purpose of investing the proceeds in other property, "such other property to be held upon the trusts above declared; that is to say, for himself during his life, and at his death to be equally divided amongst my children or their representatives, and the like power of sale is hereby conferred upon my said husband as to any property acquired by reinvesting the proceeds of sale; the substituted or acquired property in all instances to be held on the same trusts and subjects to the same power as my original estate."

Reading these two items together, it seems very clear that the testatrix intended that all of her estate should be kept together until the death of her husband, and then should be divided "between" her children, or, as expressed in the third item, "amongst" her children, and their legal representatives; that is, the place of any child of hers that should die before the falling in of the life estate to be filled by any child or children that such child so dying might leave surviving her.

Thus appears with great distinctness one of the elements of the class doctrine; that is, that the time of distribution must be fixed at a period subsequent to the time when the will goes into effect—that is, subsequent to the date of the death of the testator. This period of time may be the end of a number of years designated in the will, or at the death of a life tenant, or upon the happening of any future event indicated in the will. Next it appears that the devise is not to the two daughters of the testatrix, *nominatim,* but to the children of testatrix, and in case any child should be dead at the death of the life tenant, then to the representatives of such child or children. It was impossible to say, at the date of the execution of the will, or at the death of the testatrix, what persons would, at the death of the life tenant, answer the description of children of the testatrix, or representatives of such children, as either one of her two daughters might die before that time, or both might die, and leave children, and among these children it might be that there were several born between the death of the testatrix and the death of the life tenant, and some of these might die and others be born, and thus the beneficiaries of the devise were subject to fluctuation, either by diminution or increase. That is to say, while there could be no increase in the number of testatrix's children, yet there might be a decrease; and both increase and decrease in the representatives of the children, who might finally be the persons to take upon the death of the life tenant. So we have here the other two elements of the class doctrine—a devise to a class and

that class one subect to fluctuation, thus making the three elements that must appear under that doctrine. *Sanders* v. *Byrom,* 112 Tenn., 472, 477, 479, 79 S. W., 1028. As stated in Rood on Wills, section 480, p. 317: "If the persons to take can be ascertained only by inquiring who answer a general description, there being no other sufficient designation of them, they necessarily take as a class, and those who take take all." In *Forrest* v. *Porch,* 100 Tenn., 391, 45 S. W., 676, the second clause of the will read as follows: "I give and bequeath to my beloved wife, Ollie P. Reece, a certain tract or parcel of land, containing, by estimation, about one hundred acres, and bounded as follows: . . . To have and to hold as long as she lives; at her death the said land is to be divided between my heirs at law." Construing this language, the court said: "This is an explicit devise of land to the widow during her life, with remainder in fee to the 'heirs at law' of the testator. The chancellor treated the remainder as vested, but the court of chancery appeals was of the opinion that it was contingent. We concur in the latter view. The remainder was contingent, because the testator obviously intended the land to be divided at the death of his widow among such persons as should then sustain to him the relation of heirs at law. The remaindermen are to be ascertained, not at his death, but at the death of his widow, the life tenant; and they are to be such persons as would at that time be his 'heirs at law.' " To the same effect, *Parrish* v. *Groomes,* 1 Tenn. Ch., 581; *Beasley* v. *Jenkins,* 2 Head, 191; *Connell* v. *McKen-*

126 Tenn.—12

*na,* 2 Tenn., Cas., 190, and *Sanders* v. *Byrom,* supra. In 2 Underhill on Wills it is said that those in existence at the date of distribution "will form the class of children among whom the property is to go, to the exclusion of the heirs of those children who have died in the interval between the death of the testator and the death of the life tenant, whose shares go to the survivors. This is true, whether the limitation is to the children of the life tenant or to the children of testator. But the testator may, in providing for those children who survive the termination of the life estate, also expressly direct that the issue or heirs of any children who may die during the existence of the life estate shall take their parents' share." Id., p. 730.

As to the fixing of a period to which the distribution is postponed, it is said in *Sanders* v. *Byrom* that many of the cases do this by the use of such expressions as "then living," referring to some event, as for example, the death of a life tenant. This occurs in *Deadrick* v. *Armour,* 10 Humph., 588, 600, 601; *Land Co.* v. *Hill,* 87 Tenn., 589, 595, 596, 11 S. W., 797; *Blass v. Helms,* 93 Tenn., 166, 23 S. W., 138, and *Nichols* v. *Guthrie,* 109 Tenn., 535, 73 S. W., 107. But the establishment of the subsequent period is not necessarily indicated in this manner alone, as will be seen by an examination of *Frierson* v. *Van Buren,* 7 Yerg., 606, 27 Am. Dec., 528; *Satterfield* v. *Mayes,* 11 Humph., 58; *Beasley* v. *Jenkins,* 2 Head, 192; *Connell* v. *McKenna,* 2 Tenn. Cas., 190, and *Parrish* v. *Groomes,* 1 Tenn. Ch., 581, 583, wherein the future event is indicated simply as at, or

after, the death of some prior taker of the estate, and in *Fulkerson* v. *Bullard,* 3 Sneed, 260, the expression used is "after five years."

The class notion is disintegrated by any language in the will from which the court can see that the testator or testatrix had in mind any special individuals as the objects of the bounty intended, as distinguished from a composite class. We shall presently see, by reference to cases wherein the class doctrine was held not to apply, under what circumstances and by the use of what language the court held the class notion was dissipated. It is clear, however, from our cases, that the mere use of the words "equally" and "equally divided" will not effect that result. In *Frierson* v. *Van Buren,* supra, the words used were "equal division;" in *Deadrick* v. *Armour,* supra, "equally divided amongst all her children;" in *Satterfield* v. *Mayes,* supra, "equally divided between her daughters." In *Womack* v. *Smith,* 11 Humph., 478, 479 (54 Am. Dec., 511), where the legacies after the death of the life tenant were "given to their lawful children," it was held that this meant that the fund was to be "equally divided amongst their children." In *Morton* v. *Morton,* 2 Swan, 318, the language was "equally divided between my children;" in *Fulkerson* v. *Bullard,* supra, "equally amongst all my children;" in *Beasley* v. *Jenkins,* supra, "equally divided between all my brothers' and sisters' children;" in *Connell* v. *McKenna,* supra, "divided equally among my children;" in *Nichols* v. *Guthrie,* supra, "equally divided among the children;" in *Parrish* v.

*Groomes,* supra, "to be distributed equally between my lawful heirs."

Nor does the use of the words, "share" or "share and share alike," dissipate the class notion. In *Jackson* v. *Everett,* 3 Tenn. Cas., 811, the words were "equally, share and share alike;" and in *Fulkerson* v. *Bullard,* supra, the word "shares" was used—that is, "equally amongst all my children, and in case any of my children should die before the time aforesaid, leaving lawful children, said last mentioned children shall take the shares of their parents," etc.

The use of the words "share" or "share and share alike" are in effect no more than the providing for equality as expressed in the words "equally" or "equally divided," which is a thought essential to the class doctrine, since the persons who will ultimately form the members of the class cannot be known to the testator, so as to fix their portions; and, as said in Rood on Wills, section 484, "the proportions of the members in cases of gifts to any simple class, as to A.'s children, would be equal." If the testator should single out any individuals, either by name or in any other manner, so as to designate and distinguish them, this would necessarily break up the class idea.

The provision for substitutional representation does not render the class notion inoperative. This is apparent from several of our cases in which that doctrine has been held applicable. In the case of *Womack* v. *Smith,* supra, it appears that several legacies were given in trust for the use of testator's son, Thomas Lindsey, and

his wife, and the survivor of them, during the whole life of the survivor, and at the death of said tenants for life the legacies were given to their lawful children, "or in case of their death, or the death of any of them, to their lawful offspring." In *Fulkerson* v. *Bullard,* supra, the language of the will was, "and at the expiration of five years it is my desire and direction that my executors divide said negroes (Henry, John, Nelson, Will, Lurana and Mariah) equally amongst all my children; and in case any of my children should die before the time aforesaid, leaving lawful children, said last mentioned children shall take the shares of their parents in said negroes."

In discussing the effect of this language, the court said in that case: "Had the testator intended that the legacy should vest in such of his children as might be living at the time of his death, why insert this last clause, if 'any of my children should die before the time aforesaid, leaving lawful children, said last mentioned children shall take the shares of their parents in said negroes'? If the legacy had vested at the death of the testator, as complainant insists it did, then if either of his children had died, having a vested right to the legacy, leaving children, they would have been entitled to the legacy of their parent, as his distributees, without this last clause. But, as we think, because he did not intend the legacy to vest until the expiration of the five years after his death, he thought proper to give it then to such children as he might have living at that time. And supposing that some of his children might

die before that time, leaving lawful children, and know-ing that the grandchildren would not be embraced by the term 'children,' he thought proper to provide for such a contingency, and for that purpose inserted the last clause."

In the case of *Connell* v. *McKenna,* supra, the lan-guage of the will was: "After the death of my wife I desire my executors to take charge of my estate and divide it equally among my children, and those of my children who are dead at the time I wish their chil-dren to represent their parents and take their share of the estate." After quoting these words, the court said in that case: "We hold that these words vest the re-mainder in the children or grandchildren living at the termination of the life estate as a class, and not in severalty." In *Jackson* v. *Everett,* supra, the instru-ment, after providing for a life estate in Elizabeth M. Everett, proceeded, "and on her death the same is to go to any children she may leave at her death, and the living representatives of such as may be dead equally, share and share alike." In *Blass* v. *Helms,* supra, after the termination of the life estate the language was "to the living children of my daughter Mrs. Margaret Bris-coe, and the child or children of any of her children that may be dead." In *Nichols* v. *Guthrie,* the will pro-vided that at the death of the life tenant "all of said property is to be equally divided among the children of said Elizabeth or the descendants of such children."

We now come to those cases which have been held not to fall within the class doctrine.

Tate v. Tate.

In *Cathey* v. *Cathey,* 9 Humph., 470, 49 Am. Dec., 714, the will read: "I give and bequeath to my beloved wife, Honor B. Cathey, all my property, both real and personal, for her to divide among my children, as she may think best; but if she should marry after my death, then, in that case, it is my will and desire that my estate be equally divided among her and my children, share and share alike." It was pointed out in the opinion construing the will that no particular period was fixed for the distribution, but this was left to the discretion of Mrs. Cathey; likewise that she was given power to give such portions to the children as she might see proper, and was not bound to make them equal. Here two elements of the class doctrine were lacking. There was no particular event on the happening of which distribution should take place, and there was likewise an individualization of the children through the medium of the power of the wife to divide among the children as she might see proper, thus recognizing her power to regard the individual merits or needs of the children, and to appropriate her husband's property accordingly.

In *Bridgewater* v. *Gordon,* 2 Sneed, 5, the language of the will was:

"I give to my beloved wife, Elizabeth Moores, during her life or widowhood, all my estate, both real and personal, to be used by her for the purpose of raising and educating my children, and that she may at her discretion, at any time, give to any of my children, at their

marriage or settlement in business, such portion of my estate as she may consider expedient and proper; provided, that such portion so given shall not exceed their distributive share; and provided, also, that all such portion of property so given by her shall be valued by two or more disinterested and competent men, and that an account of all such property so given shall be kept by my executor, so that at the final settlement all my children may have received equal portions, share and share alike.

"Secondly. At the death or marriage of by said wife it is my will that my estate be equally divided between my children, share and share alike, having a just and equitable regard to such portions of property as may have been given to any of them by my wife as afore-authorized, so that no one of them may receive more than another."

In commenting on this language, stress was laid upon the provisions made for advancements to the children, and then for the subsequent equalization, so as to make the shares the same. The provision for advancements indicated that the mind of the testator was upon each individual child, showing a purpose to create an estate in severalty.

In *Harris* v. *Alderson,* 4 Sneed, 250, the will was: "I give and leave in the hands and possession of my two sons, William B. Alderson and Balthus C. Alderson, the one-fourth part of said balance of all my estate and the increase thereof, to be by them taken care of for the express use and benefit of my daughter, Susan Al-

derson, and her children that she now has or may have, and apply it to their use and benefit, and no other whatever, and at her death to be equally divided between her children." The court held that the children were individualized by the use of the expression "that she now has or may have," and thus distinguished it from *Satterfield* v. *Mayes,* and held it to fall under *Bridgewater* v. *Gordon.* "The property is for the use and benefit of said Susan and her children, *'that she now has or may have.'* To these—that is, to those children then in being, three in number, or that might thereafter be born to her—the property is to go at her death. The remainder could not be more fixed or certain in each child then in existence, opening to let in such as might be born afterwards, if they had been named."

In *Petty* v. *Moore,* 5 Sneed, 126, it appeared that the testator, by his will, devised and bequeathed his estate, both real and personal, to his wife for life, with the remainder to his eleven children equally. By a codicil he devised and bequeathed in trust to his three sons, William, Samuel, and Armstead, Jr., in fee all the property, both real and personal, that should be coming to his seven children, *viz.,* John, Francis, Robert, Alexander, Mary, Louisa, and Catherine, at the death of the widow, to use, manage, and control for the benefit of the above-named seven children. Then followed this provision: "I do will and declare, if any of my eleven children shall die without an heir of their body, that all of the property that shall ever descend to them, from me, shall return and be equally divided among the remainder of

my heirs that shall be living." In this case the children were named, and, of course, the class doctrine did not apply; but the estate was vested at once upon the death of the testator, subject to be divested on the happening of the contingency last quoted.

In *Alexander* v. *Walch*, 3 Head, 493, the will was in this language: "I give to my sister, Nancy, all my land estate, and negro man, named Abe, and a negro boy, named Stephen, during her natural life, then to be sold and equally divided amongst my sisters and brother." The testator had only one brother and two sisters. This individualized the persons as distinctly as if the names had been given. The court said: "There was no uncertainty or contingency as to the legatees. He had only one brother and two sisters, and to them the remainder is given. The gift is as perfect and explicit as to the persons who are to take as if they were named. The remainder vested in his brother, William, and sisters, Margaret and Mary, under the description of brother and sisters, upon the death of the testator, in the same manner as if their names had been inserted."

In *McClung* v. *McMillan*, 1 Heisk., 655, the will was: "In order to enable my dear wife, Margaret, to raise and educate our children, I do give and bequeath to her all my property, both real and personal, to have, manage and use during her natural life, and at her death to be equally divided among all my children. None of my property shall be sold without my wife's consent, and I do not desire a public sale of anything." After appointing his wife his executor, he executed a will, and

afterwards made a codicil in the following words: "It is my will that, if my wife should die before our youngest children are raised and educated, they shall be entitled to as much more than the other children as will raise and educate them. This is to constitute part and parcel of my will."

Construing this will, and holding that it did not fall under the class doctrine, the court referred especially to the power given the wife to use and appropriate the fund to the raising and educating of the children, "which power necessarily implies," said the court, "that the fund might be appropriated in unequal proportions for the raising and educating of the several children." The court also referred to the provision made for the younger children, whereby, at the death of the wife, they were to have as much more than the others as would educate them. It was said that these provisions were inconsistent with the assumption that the children took as a unit, having a joint interest in the estate.

In *Puryear* v. *Edmondson,* 4 Heisk., 43, the language under consideration was: "My will and desire is, and I do will and appoint, that the moneys arising from the sale of the lands and personal property willed and directed to be sold after the death of my wife be equally divided between the children of my brother, John Winstead, and my nephew John Koning, sister Mason Wilson, and the children of said Mason Wilson, each one to have an equal share; and should any of the above persons or beneficiaries object or contest my will, I will and

direct that the share of such person or beneficiaries in this item of my will so contesting be withheld and abstracted from his or her share, and given to such of the persons or beneficiaries in this item of my will as shall not contest the same." The court held that the language quoted indicated that the legatees were all in the mind of the testator when he wrote his will, and were severally the objects of his affection. The court said that this was "most manifest from the manner in which they are named in the will, and that he intended to vest each of them with an individual interest in the same is apparent from his repeated declarations of an intention that one shall not have more than another, but that they shall share his bounty equally." The court then notes specially the fact that the bequest was to my "brother John Winstead's children, and my nephew Koning, and my sister Mason Wilson, and her children." Here was a distinct individualization of the nephew, Koning, and the sister, Mason Wilson.

We may note in passing that in this case, and in the previous case, and in some of the others in this line of cases, stress is laid upon the use of the words "equally" or "equally divided;" but it is to be noted that in this class of cases this language is used in connection with a reference indicating some individual persons in the mind of the testator whose shares were to be made equal with others. We have already pointed out that in the line of cases falling under *Satterfield* v. *Mayes* the same language appears, and that it is an essential element in that class of cases that there should be an

Tate v. Tate.

equal division when the time of distribution arises, because in the absence of such provision for equal division, either express or implied, there would be an individualization of the objects of testator's bounty, that would destroy the class notion.

In *Green* v. *Davidson,* 4 Baxt., 488, it appeared that Joseph Kellar died about 1840, leaving a widow and twelve children; that by his will he left his land to his wife during life or widowhood, and upon her death or marriage he directed his land to be sold on a credit of one, two, and three years, "and the money to be equally divided among his children, and that if any of his children marry, that they have an equal part of his estate as those already married, to be given them out of his perishable property." He directed that his children should be made equal, taking into consideration what he had given those already married. The provision with reference to children that should hereafter marry and those already married clearly indicated that the testator had in mind individual children.

In *Whitman* v. *Young,* 1 Tenn. Ch., 586, the language was: "At the death of my wife, it is my will, and I do direct, that the above lot, with the house and shop thereon, with the tools belonging to said shop, be sold on a credit of one, two, and three years, and the proceeds of the sale to be equally divided among my children, share and share alike, one share to go to my grandson, Charles H. Wallace, and one share to go and be vested in my two grandsons Mark Judd and Jacob Judd, and the lawful issue of their bodies. Should

either of them die without such issue living at the time of his death, then this share to vest in the survivor and his issue. Should both of them die without such issue at the time of their death, then in that case said property to descend to my heirs forever." The court said: "The present will does not give the property to a class in the same degree, for it distinctly gives a share equal to the share of the testator's children to one grandson, a son of a deceased daughter, and a similar share to two other grandsons, the children of another daughter. These grandsons are designated by name. We have, therefore, different classes, and some of the devisees expressly named. It is true that the shares of the grandsons are, in the contingency of their dying without issue living at the death of the survivor, to go to the testator's heirs. But the intention to give a several benefit to particular devisees is clear, and this is sufficient to take the case out of the class rule." Here it is perceived that there was not one classification merely, but two, and individuals were specialized and named.

In *Allen* v. *Allen*, 2 Tenn. Ch., 28, the language of the will was: "To avoid misunderstanding or confusion, I will and bequeath to each of my children an equal share of my estate after deducting from the receivers the several portions as I have specified above." The court said: "There can be no doubt that the testator's children took vested and transmissible interests in remainder in the proceeds of sale, for the intention is clear to give each child a several interest." *Whitman* v. *Young*, 1 Tenn. Ch., 586: In the first sentence of the

opinion it is said: "By the will of Matthew P. Walker, which was recorded in 1851, his property was devised to his widow, Agnes Walker, for life, and then to be sold and the proceeds divided among his children equally, after deducting advancements as shown by the will." The provision for advancements individualized the children, showing that he had in mind each child.

In *Davis* v. *Goforth,* 1 Lea, 31, the devise under consideration was to defendant's mother for life, "and at her death to be equally divided between her children, to belong to them, their heirs and assigns, forever." The mother had nine children. The court said: "It is well settled that anything that indicates an intention on the part of the testator that one or more individuals of the designated class shall enjoy a several interest is sufficient to give to all of the class a vested and transmissible estate. *McClung* v. *McMillan,* 1 Heisk., 655. The closing words of the devise under consideration show that the testator was not looking alone to his children as a class, but as individuals whose heirs and assigns might, in some contingencies, take." It was accordingly held that each child took a vested interest in remainder in the land. The closing words on which the distinction was based were "their heirs and assigns." This indicated that the land might pass to the heirs of each child, or the land might be assigned or sold. This situation could not exist under the class doctrine, because until the happening of the contingency on which the distribution is to take place it is not known who the owners may be. The distinction here is very

slight, but was considered sufficient by the court in the case referred to. Of course, ordinarily the expressions "heirs and assigns forever," or "heirs forever," indicate a purpose to convey an estate in fee; but in the present case the court attached to them the meaning above referred to as designating a purpose to give a severable interest.

*Owens* v. *Dunn*, 85 Tenn., 131, 2 S. W., 29: "It is my will that my property be kept together under the direction of my wife, and executors, A. P. Bradford and N. B. Dunn, and that my children be as thoroughly educated as circumstances will admit of, and as they marry off, give each a decent outfit, which shall be equal, and at the death of my beloved wife, the property to be equally divided between my children." Here the provision for the education of the children, and for apportioning them off as they married, and the direction to give "each a decent outfit," clearly showed that the testator had in mind each individual child.

*Balch* v. *Johnson*, 106 Tenn., 249, 61 S. W., 289: The provision in the deed was: "To Mrs. Julia Johnson, wife of Andrew Johnson, Jr., during her lifetime, and at her death to the bodily heirs of said Andrew Johnson, including Ellen Evers, stepdaughter of Andrew Johnson, Jr.," etc. Here the mention of Ellen Evers disintegrated the class notion, and it was held that she had a "vested, transmissible remainder."

*Smith* v. *Smith*, 108 Tenn., 21, 64 S. W., 483: "I will and bequeath to my beloved wife . . . all my real estate . . . after the payment of my just debts. After the death

of my wife . . . I will and bequeath to my son, Samuel F. Smith, and his heirs, equal shares in my home farm." The court held that the word "heirs" meant children, and said: "The devise in question is of a severable interest to the son Samuel, and it may be regarded as settled that, where there is anything in the will indicating an intention on the part of the testator that 'one or more individuals of the designated class shall enjoy a several interest,' this is sufficient to give all of the class a vested and transmissible interest."

All the foregoing cases are grouped in the case of *Sanders* v. *Byrom,* supra. Among these are also the cases of *Ward* v. *Saunders,* 3 Sneed, 387, and *Elkins* v. *Carsey,* 3 Tenn. Cas., 392, which we have not until this time, considered in the present opinion. In *Sanders* v. *Byrom* it was said that these two cases were to be classed with those falling under the case of *Bridgewater* v. *Gordon,* but that they seemed to ignore the rule stated in that and similar cases, and were not in line with previous or subsequent cases. We have given further consideration to these cases, and now state our conclusions as follows:

In *Ward* v. *Saunders,* 3 Sneed, 387, it appeared that the clause of the will under construction was: "I will that all my estate, both real and personal, that may come to the hands of my executors, for the use and benefit of my daughters, Levisa Saunders, Catherine Campbell, and Celia Stone, remain in the hands of my executors, in trust for my said daughters during

126 Tenn.—13

their natural lives, and then to the heirs of their bodies forever."

The question in the case arose upon the estate devised to Levisa Saunders during her natural life, and then to the heirs of her body forever. She had five children, Tabitha M. Harris, who married Baker W. Harris, Mary H. Perdue, who married John W. Perdue, and three sons. Mrs. Harris and Mrs. Perdue died during the lifetime of their mother, Levisa, leaving their husbands surviving. Mrs. Harris left three children, and Mrs. Perdue one. Baker W. Harris administered upon the estate of his wife, and also upon that of Mrs. Perdue.

The court, after holding that the words "heirs of the body" were to be construed as words of purchase, and not of limitation, proceeded:

"This is conceded; but it is contended by the counsel for the three children of Mrs. Saunders, who survived her, that the proper meaning of the word is 'children,' and that the devise and bequest should be construed as if the word 'children' were used in the will, and that, as the children constitute a class, the three sons who survived the mother are the class, and entitled to the entire benefit of the bequest, according to the case of *Ivey, Admr.,* v. *Satterfield,* 11 Humph., 58.

"In order for this rule to apply, there must be a class of persons who are objects of the bequest. The fund in this case was composed of various kinds of property—lands in Tennessee, lands in Kentucky, or, if the

executors thought best to sell, proceeds of Kentucky lands, negroes, and other personal property.

"The words 'heirs of the body' include children as a class, it is true, and also include other classes, as grand-children, great-grandchildren, etc. When used in application to real estate, where property is given to the heirs at law of any person, the words are construed strictly; where it is given to the heirs, the rule is flexible, and may mean next of kin, or heirs at law, according to the nature of the property given, whether real or personal. . . .

"The words 'heirs of the body' are also flexible, and mean, if applied to personalty, that children, next of kin, should take; or, to use the words of the vice chancellor in the case of *Patterson* v. *Johnson,* 17 Law & Eq. Rep., 21, 'I apprehend that there can be no doubt, where the words "heirs," or "heirs of the body," are used, that the meaning is flexible. When applied to real estate, they must be construed according to their strict legal meaning; but when used as to personalty, the word "heirs" is held to mean next of kin, and the words "heirs of the body" interpreted as next of kin, issue of the body.' . . .

"It is our opinion that all persons who were in being at the death of Mary Bowen" [the testatrix], "and were embraced by the expression 'heirs of the body' of Mrs. Saunders, were objects of the gift in remainder, and took vested interests, which would pass to their representatives on their death—real estate to their heirs at law, and the remainder in the personal estate

to "their personal representatives; and when children of Mrs. Saunders were born from time to time, the estates in remainder would open, and vest severally in such children."

"In the present case, the legal estate in remainder vested severally in the five children of Mrs. Saunders."

The case seems to turn upon the use of the term "heirs of the body," which expressed, not one class, but several, as children, grandchildren, and great-grandchildren, and also upon the fact that there was both real and personal property involved, and as to real property these words must be given their strict technical meaning, while as to personal property they would mean next of kin. In this view it was held that the class notion did not exist.

In *Elkins v. Carsey*, 3 Tenn. Cas., 292, it appeared that the testator devised land to two of his daughters "during their natural life, and to their children, respectively, at their death." By a clause immediately preceding this, he had devised land to another daughter, to her and to her children living at the time of her death;" "that is," continues the opinion, "devised the remainder to vest in a class *in futuro*." It was said that this evidenced that by the language used in the clause first quoted the testator intended "to vest the remainder *in praesenti* in his grandchildren as tenants in common." The opinion was delivered by a special judge, is very brief, less than half a page, and refers to no authority. The reasoning of the opinion, implied rather than expressed, seems to be that inasmuch as

Tate v. Tate.

the testator had used language in reference to the property devised to one daughter which left no doubt that the class doctrine was to apply ("and to her children living at the time of her death"), and followed this by a devise to his two other daughters in which this expression was omitted, and there was substituted for it the expression "and to his children, respectively, at his death," he understood the two expressions as conveying a different meaning; that by changing the form of the language he intended also to change the thought, and to pass a different estate. This case, therefore, stands on its own peculiar facts, and in no respect impairs, or was intended to impair, the authority of those cases (*Frierson* v. *Van Buren*, 7 Yerg., 606, 27 Am. Dec., 528; *Satterfield* v. *Mayes*, 11 Humph., 58; *Beasley* v. *Jenkins*, 2 Head, 192; *Connell* v. *McKenna*, 2 Tenn. Cas., 190; *Parrish* v. *Groomes*, 1 Tenn. Ch., 581) wherein the future event was indicated simply as at or after the death of some prior taker. *Sanders* v. *Byrom*, 112 Tenn., loc. cit., 478, 79 S. W., 1028.

All of the cases on this subject, up to the time that *Sanders* v. *Byrom*, supra, was decided, were catalogued and classified in that case, except the following, which have been collected by counsel in the present case, *viz.*: *Lockwood* v. *Nye*, 2 Swan, 519, 58 Am. Dec., 73; *Rogers* v. *Rogers*, 2 Head, 660; *Forrest* v. *Porch*, 100 Tenn., 391, 45 S. W., 676. In neither of these cases, however, was the class doctrine in terms referred to. In *Lockwood* v. *Nye* there was no occasion for it, since the persons who were to take were named in the will. *Rogers*

v. *Rogers,* turned upon the rules applicable to the execution of powers, but in the final analysis the property was disposed of under the class doctrine. In *Forrest v. Porch* the doctrine was applied as necessarily suggested by the facts, and the discussion was upon the subject whether the persons answering the description of "heirs" of the testator at the death of the widow were to take *per stirpes* or *per capita,* at the time fixed in the will for distribution.

The present opinion, and *Sanders* v. *Byrom,* supra, we believe, when taken together, furnish a fairly full review of the doctrine as understood and administered in this State. This doctrine, like the rule in Shelley's Case, is not difficult to state, but, also like the rule in that case, is difficult to apply to concrete facts. The difficulty, we think, has arisen out of the effort to escape its effect by making subtle distinctions. The better course, it seems to us, is to adhere to the plain rule, unless there is a clear indication in the will, or other instrument, that the maker of it had in mind particular individuals. Otherwise, grievous mistakes will continue to be made in the construction of instruments on which business and other property rights are based.

The court of civil appeals held that under a proper construction of the will of Mrs. Hillsman the class doctrine did not apply. Therefore Mary T. Hillsman took a vested remainder in an undivided half interest in the property which her mother devised. It was therefore held by that court that certain trust deeds which were executed by John T. Hillsman, the owner of the life

estate, and his daughter, Mary T. Hillsman, prior to her death in 1905, conveyed, for the security of the debts therein mentioned, an undivided half interest in fee in the land described in those deeds; also that a will executed by Mary T. Hillsman likewise conveyed or passed an undivided half interest in the land, subject to the trust deeds. Having reached a conclusion different from that expressed by the court of civil appeals in respect of the class doctrine, it now becomes necessary to dispose of certain defenses by way of estoppel which are set up in the answers of the trustees and beneficiaries in the trust deeds mentioned.

In order to properly understand this matter, it will be necessary to state the following general facts in respect of the trust deeds referred to, and some other instruments in connection therewith:

On the 23d of February, 1897, John T. Hillsman and his daughter, Mary T. Hillsman, executed a trust deed upon some of the lots to secure Miss Florence Frayser in a loan of $5,000. Shortly afterwards another trust deed was executed to secure a loan of $1,000 made by Turley & Wright. On March 30, 1899, the same parties executed a trust deed to secure what is known as the "Morris loan" for $4,000. On June 19, 1902, the same persons executed another trust deed to secure a loan of $5,000 made by the Clark heirs, known in this record as the "Clark trust deed." The Frayser loan was paid off; the proceeds of the Morris loan being used for that purpose. All of the Morris loan has been

paid off, except about $1,900. The Clark loan remains entirely unpaid. About $2,000 of the Clark loan was used to take up that much of the Morris loan.

At the death of Mrs. Hillsman, in 1883, her property was heavily incumbered with taxes, and during subsequent years, up to 1897, other taxes accrued thereon. While the property was in the hands of the life tenant, John T. Hillsman, several bills were filed in the chancery court at Memphis, by the State and county, and by the city of Memphis, to recover these taxes. The whole matter eventuated, so far as this record shows, in a purchase by one M. Nealis of several pieces of the property of the estate, for which he paid into court the consideration. This money was prorated on the taxes due, and all taxes remaining unpaid were stricken off by the court. Subsequently M. Nealis conveyed this property to Hon. T. B. Turley for the benefit of the estate, for which he was paid $6,000.

The taxes for which the property had been sold covered the period, as stated, from 1867 to 1897. That part which accrued from 1883 up to 1897 was due from the life tenant, John T. Hillsman, and the remainder estate was not liable. However, the two daughters were made defendants to these tax proceedings, and the matter treated as if the whole estate was liable. The records in the tax cases are not before us with sufficient fullness to enable us to judge of their validity, but there is no question made on that subject. We are bound, therefore, to treat the case as if the whole $6,000 was

paid to relieve the land from a burden which rested on all of it.

It is impossible to say from the evidence precisely how much of the Frayser loan was used in paying taxes. There is, in the record, an account taken from Senator Turley's books after his death, which account was rendered to John T. Hillsman and Mary T. Hillsman. This throws some light on the matter.

It appears from this account that $3,641.43 was paid to Nealis; that $1,333 was paid to F. H. Heiskell, attorney, on taxes on certain property. This aggregates $4,974.43. There were incidentals connected with these matters as follows: Two hundred dollars to Judge Minor for investigating the title at the time the Frayser loan was made, $200 to Senator Turley for making a compromise with Nealis, and some other small matters for effecting releases and so on, aggregating $437. 40. This, added to the previous sum, makes $5,411.83, as shown by this account, paid on taxes by John T. Hillsman and Mary T. Hillsman. But, in addition to the money borrowed from Miss Frayser, there entered into the fund from which the taxes were paid $2,812.71 from other sources. The total amount for which the account was rendered and debits and credits shown was $7,812.71, and credit was taken for various other amounts paid out besides the taxes. It is therefore difficult to say from this account how much of the Frayser loan was used for taxes. But there is a deed in the record, made by complainant to Mary T. Hillsman, in which it is stated that the latter had borrowed

money and paid between $5,000 and $6,000 on the taxes. The only sources shown are the Frayser loan of $5,000 and the Turley and Wright loan of $1,000. We think it clear that at least $4,000 of this came from the Frayser loan.

There is another phase of the controversy, under which the claimants through the Morris trust deed and also those claiming under the Clark trust deed insist that complainants are estopped to deny the right of Mary T. Hillsman to deal with the property which she embraced in these trust deeds as though the one-half interest conveyed was her own in fee, subject only to the life estate of her father, John T. Hillsman. This phase arises out of several bills filed in the chancery court of Shelby county, and also several conveyances made by Mrs. Tate.

It is alleged that on July 18, 1895, complainant filed one of the bills referred to; but on examining the record she appears to have been a defendant to that bill, and we need say nothing more about this. However, on the 3d day of March, 1899, complainant and her husband filed a bill against her father, John T. Hillsman, and her sister, Mary T. Hillsman, which contained the following allegations: "That Mary H. Hillsman died August 21, 1883, leaving surviving her as her husband the defendant John T. Hillsman, and her two daughters, the complainant Martha H. and the defendant Mary T.; that by the will of said Mary H. Hillsman, which was probated August 31, 1883, her entire property was given and devised to her said husband

for life, with the remainder in fee to her said two daughters, said property consisting of," etc. (describing it). The bill charged that the life tenant had permitted taxes to become delinquent to a large amount; that about a year prior to the filing of the bill one M. Nealis had bought the property at chancery sale for taxes, and was about to be put in possession thereof by writ of possession from the chancery court; that defendant John T. Hillsman and defendant Mary T. borrowed money to the amount of $5,000 on their trust deed (the Frayser trust deed), conveying their interest in said property with power of sale to secure said sum with which to satisfy said Nealis; that said taxes for which these sales were made were those which had accrued during the life estate of said J. T. Hillsman, and had been permitted by him to become delinquent, although he was all the while receiving a rental income from said property largely more than sufficient to pay all taxes, and repairs and insurance thereon. "Defendant John T. Hillsman procured his daughter Mary T. to join him in said trust deed conveying her interest in said property, and applied to complainant Martha H. to also join, which she refused to do, as she believed that it would very likely result in a loss to her of the property given to her by her mother's will." The bill further charged that the property had fallen into decay, that John T. Hillsman was insolvent, and prayer that a receiver be appointed to take charge of the property, collect the rents, pay taxes, and make repairs. This bill was sworn

to by J. C. Tate. This cause was dismissed by consent on May 27, 1902.

Prior to this time, on February 2, 1897, a bill had been filed by the present complainant against her father and Mary T. Hillsman and M. Nealis to have the tax title of Nealis and the claims of the State and city declared clouds upon her title, etc. This bill likewise described the interest of herself and her sister in the same manner in which it was described in the bill already referred to. This bill was sworn to by Mrs. Tate.

On August 17, 1899, complainants executed a trust deed to one Percy Galbreath, trustee, to secure $2,000 borrowed from N. B. Johnson. In this instrument they described the property conveyed as the "undivided one-half interest in the following property," etc., describing one of the lots derived from the estate of complainant's mother. The trust deed also contained a covenant to the effect that complainants were lawfully seized in fee. John T. Hillsman joined in the instrument.

On the 1st day of June, 1901, complainants, joined by John T. Hillsman, executed a trust deed to W. D. Gavin as trustee to secure $1,000 borrowed from Mrs. Ermine Raymond. The property described was the undivided one-half interest of the said Martha H. Tate and the one-half undivided life interest of John T. Hillsman. The trust deed contained a covenant that the conveyors "were seized in fee" of the property described.

On June 20, 1902, Tate and wife joined in the deed above referred to, which was made to Mary T. Hillsman, in settlement of the tax account between them.

This deed contained the following recitals: "Whereas, the said Martha H. Tate and the said Mary T. Hillsman are the only children of Mary H. Hillsman, deceased; and whereas, the said Mary H. Hillsman, by her last will and testament, gave her entire estate, real, personal and mixed, wherever situated, to her husband, John T. Hillsman, and his heirs and assigns in fee simple absolute, in trust to hold the same for his own use, benefit, and behoof, during his natural life, and at his death to be equally divided between her said children, share and share alike, in fee; and whereas, at the time of the death of the said Mary H. Hillsman, her real estate so devised in her said will was heavily incumbered by taxes; and whereas, after her death additional taxes accrued thereon; and whereas, several years ago it became absolutely necessary to raise money to pay said taxes in order to save said real estate; and whereas, the said Mary T. Hillsman joined with her father, the said John T. Hillsman, in borrowing upon his and her said individual notes between $5,000 and $6,000, which notes have been secured by trust deeds on the undivided one-half interest of the said Mary T. Hillsman on certain portions of the real estate so devised by the said Mary H. Hillsman, and also on certain real estate belonging to Mary T. Hillsman individually; and whereas, said money has been used in paying off said taxes; and whereas, the money thus raised by the said Mary T. Hillsman, which has been so used in paying off said taxes, has inured equally to the benefit of the undivided one-half interest of the said Martha H. Tate in the real es-

tate so devised by the said Mary H. Hillsman, de-
ceased; and whereas, the said Mary T. Hillsman has
already paid a portion of the money so borrowed by
her, and will, together with her father, have to provide
for the payment of the balance of said money; and
whereas, it is not convenient for the said Martha H.
Tate and her husband, J. C. Tate, to pay in money their
portion of the taxes so settled by the said Mary T. Hills-
man as aforesaid; and whereas, the said J. C. Tate and
Martha H. Tate have agreed to convey to the said
Mary T. Hillsman the undivided one-half interest of
said Martha H. Tate in the lot or parcel of ground
hereinafter described, and which lot or parcel of ground
constitutes part of the real estate devised as aforesaid
by the said Mary H. Hillsman to her said two children,
in payment and satisfaction of the one-half of
said taxes mentioned above, which should have
been provided for by the said Martha H. Tate; and
whereas, the said Mary T. Hillsman is willing to accept
the undivided one-half interest of the said Martha H.
Tate in and to said lot or parcel of real estate in full
and complete satisfaction of all the claims she has
against the said Martha H. Tate for the half of the taxes
so settled by her as aforesaid: Now then, in considera-
tion of the premises, and of the fact that the said Mary
T. Hillsman has raised the money with which the taxes
aforesaid have been paid and satisfied, the said Martha
H. Tate and the said J. C. Tate, her husband, have given,
granted, bargained, sold, aliened, and conveyed, and by

these presents do give, grant, bargain, alien, and convey, unto the said Mary T. Hillsman and her heirs and assigns forever, the undivided one-half interest of said Martha H. Tate in and to that certain lot or parcel of land lying in the city of Memphis" [describing it], "to have and to hold the same, together with all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining, to her, the said Mary T. Hillsman, and her heirs and assigns in fee simple forever."

On the 17th of June, 1902, complainants, joined by John T. Hillsman, and also by Thomas B. Turley, as trustee under the will of Mary H. Hillsman, executed a trust deed to M. Gavin and Percy Galbreath purporting to convey "all title in and to the following property located in Memphis, Shelby county, Tennessee, and more particularly described as follows, to-wit: Being an undivided one-half interest in" certain lots described. "And we covenant to and with the said M. Gavin and Percy Galbreath as such trustees that we are lawfully seized in fee of the above-described property; that we have a good right to sell and convey the same; that the same is free from all incumbrances; that we will, and our heirs shall forever, warrant and defend the title thereto, to them as such trustees, and their successors and assigns, against the lawful claims of all persons whomsoever."

Within a day or two after the trust deed just referred to was executed, Mary T. Hillsman, likewise

joined by John T. Hillsman and by Thomas B. Turley, conveyed what she described as being her undivided one-half interest in certain of the property, and contained a covenant in substance the same as that just set out.

This latter trust deed is the one now in controversy, which was made to secure the debt due the Clark heirs.

Now it is insisted by defendants that these statements as to title made in the bills filed by complainant and her husband, and the statements on the same subject made in the deeds which we have mentioned, and which instruments were recorded in Shelby county, were representations to all the world that complainant claimed an undivided one-half interest in fee in remainder in property which passed under her mother's will, and that she conceded the same right to her sister, Mary T. Hillsman, and that she is now estopped to deny this construction which she placed upon her mother's will.

It is further insisted in behalf of the Clark heirs that the attorneys who investigated the title to this real estate, before the trust deed was taken, carefully examined the bills referred to, and also the trust deeds, and were influenced in reaching their conclusion by this long continued and consistent construction of the title. It is proven that they were in part so influenced. It likewise appears, however, that these attorneys made a careful investigation of the will, and reached their conclusion, upon a consideration of the authorities affect-

ing the subject as they viewed them, that the class doctrine did not apply, and that the construction which Mrs. Tate and her husband had put upon the will was sound in law.

It is likewise insisted in behalf of the Clark heirs that Senator Turley represented Tate and wife in the loan referred to, and that he was conferred with as their agent and attorney, and he so construed the will. Tate and wife, however, deny that Senator Turley was their attorney, and the fact is not proven. We may add that the evidence is in conflict as to the construction put on the will by Senator Turley. There is evidence by two witnesses that he did put the construction on it referred to. However, there is a writing in the record, the deed which he, as trustee of the estate, along with John T. Hillsman, made to Barksdale of a part of the Lauderdale street property above referred to, which shows clearly that, at that time, at least, he regarded that property as the property of the estate of Mary H. Hillsman, regardless of the conveyance which had been made on June 20, 1902, by Tate and wife to Mary T. Hillsman; since it appears that the two $500 notes for purchase money taken in that transaction, payable to Senator Turley as trustee, were referred to by him as a part of the estate of Mary H. Hillsman.

It is also insisted on the part of the Clark heirs that the trust deed which was made by Tate and wife on June 17, 1902, under which they borrowed $5,000

from these persons, was a part of the same transaction under which Mary T. Hillsman borrowed a like amount. The proof, however, does not sustain this contention. It is shown that Tate and wife began an independent transaction for the purpose of borrowing $5,000, and that while this loan was under way John T. Hillsman conceived the notion of borrowing the same amount, and induced his daughter Mary T. to join him in the trust deed which is the subject of the present controversy. Tate and wife state distinctly in their depositions that they had nothing to do with the loan effected by John T. Hillsman and Mary T. Hillsman near the same time, and we are satisfied that such is the fact.

It is insisted for the Clark heirs that Tate and wife really believed that her title was contingent upon Mrs. Tate surviving her father and her sister—that is, her absolute title in fee—and while knowing this fraudulently procured money and permitted her sister to procure money under the representation that each owned an undivided one-half interest in a vested remainder, subject only to the life estate of John T. Hillsman. This is based upon a statement in the depositions of these two witnesses, to the effect that they always believed that Mrs. Tate would not own any interest in the fee in the property unless she survived her father. This opinion was expressed by the witnesses when they were trying to avoid the effect of the representations made in the bills and trust deeds. It was said, in effect, that these instruments were drawn by counsel, and they did

not understand them, and did not intend to make a false representation as to her title. Reading the two depositions, however, each as a whole, it is apparent that complainant and his wife had no very clear idea as to their legal rights under the deed; that they believed, in a general way, that Mrs. Tate would own an undivided one-half interest in the property at the death of her father. We have no doubt that they thought, when they were making the conveyances which they did make, they were binding Mrs. Tate's one-half interest in the property. In short, we cannot reach the conclusion from this record that Tate and wife had a superior knowledge of the true legal meaning of the will, and that they believed this true meaning would escape the scrutiny of counsel advising lenders, and thereby they would be enabled to practice a fraud upon persons having money to lend, or that their sister would be enabled to do the same thing. We do not think any fraud was practiced. We believe that Tate and wife, as well as Mary T. Hillsman and her father, all thought that the will bore the construction which was given it in the bills, and in the deeds referred to.

Before considering the questions of law arising, it is proper to state that complainants do not deny the validity of the trust deeds made by them, or at least their present binding force, so far as not already canceled by payment or settlement. These instruments were only introduced in evidence in the present case for the purpose of showing how Tate and wife had understood and

treated their title. The only trust deeds now in contro-versy are that one made by Mary T. Hillsman and John T. Hillsman to secure the debt due to Morris, guardian for the Davis heirs, and the trust deed made by the same parties to secure the Clark heirs.

It is insisted that a judicial estoppel arises against complainants out of the statements which were made by them as to the title in the two bills above referred to. The law upon this subject, as exhibited in our cases, is to the effect that where one states on oath, in a former litigation, either in a pleading, or in a deposition, or in oral testimony, a given fact as true, he will not be permitted to deny that fact in a subse-quent litigation, although the parties may not be the same. *Hamilton* v. *Zimmerman,* 5 Sneed, 39; *Cooley* v. *Steele,* 2 Head, 605; *Stillman* v. *Stillman,* 7 Baxt., 169, 175; *Stephenson* v. *Walker,* 8 Baxt., 289; *Nelson* v. *Claybrooke,* 4 Lea, 687, 692; *McEwen* v. *Jenks,* 6 Lea, 289; *Watterson & Riley* v. *Lyons,* 9 Lea, 566; *Mc-Coy* v. *Pierce,* 1 Tenn. Cas., 87. But such statements will not estop the party from proving the truth, if he can show they were made inconsiderately, by mistake, or without full knowledge of the facts. *Allen* v. *West-brook,* 16 Lea, 251, 255, 256; *Seay* v. *Ferguson,* 1 Tenn. Ch., 287; *Chilton* v. *Scruggs,* 5 Lea, 308; *Smith* v. *Fow-ler,* 12 Lea, 163. The estoppel does not apply to mere conclusions of law upon undisputed facts. *McLemore* v. *Railroad,* 111 Tenn., 639, 666, 667, 69 S. W., 338; *Murrell* v. *Watson,* 2 Tenn. Cas., 244; *Barnes* v. *Brown,*

1 Tenn. Ch. App., 726; *Verhine* v. *Ragsdale,* 96 Tenn.. 532, 35 S. W., 556.

In *Cooley* v. *Steele,* supra, a married woman was held estopped to claim certain negroes by a statement which she had made in a former deposition that she had sold all her right and interest in said slaves to one Steele and considered that she had no interest in the matter.

In *Nelson* v. *Claybrooke,* supra, an heir was held estopped to claim certain land by a deposition given by his ancestor in a former case to the effect that he had conveyed the property to Claybrooke for a valid consideration; that there were no reservations made, except those expressed on the face of the deed; and that the land in controversy was embraced in his deed to Claybrooke.

. In *McCoy* v. *Pierce,* supra, one Munsher was held estopped to claim certain land because in a former suit he had testified that he had no interest in it, and that it belonged to his daughter.

In *Grier* v. *Canada,* 119 Tenn., 17, 107 S. W., 970, a party was held estopped to question the probate of a will in the county court, where he had alleged in a former proceeding that that probate was good, and had relied on it.

We do not think that the present case falls under either of the foregoing authorities. The bills referred to did not purport to state any fact within the knowledge of the complainants therein, but only a construction of the will of Mrs. Tate's mother. This will was a matter of record, and was open to examination by

every one. No one can be said, in a legal sense, to have been misled by such a construction, since the construction of a writing is a pure question of law. Of course, if in the suit referred to, rights had been based upon the construction stated in the bill, and assented to, and acted on by another person interested therein, a different question would arise; but we have no such question here.

As to the construction which Mrs. Tate placed upon the will in the various trust deeds executed by her and her husband, the case is equally clear. Not only the reasons just stated fully apply, but the additional reason that no one can claim an estoppel by deed who is not either a party or a privy thereto. The defendants in the present case do not occupy either relation. In addition it may be stated, on the general subject of estoppel, that it cannot be held operative against any one, unless the statement complained of was made under such circumstances as justified the other party in relying on it, and unless it was relied on, and then it will not be binding where such other party had equal opportunity of ascertaining the truth of the representation.

The principle stated is more fully set forth and illustrated in the case of *Parkey* v. *Ramsey,* 111 Tenn., 302, 76 S. W., 812. The case is stated succinctly in the headnote as follows:

"Where land held by husband and wife as tenants by the entirety is devised by the husband to the wife for life, and the remainder to their two daughters, and

Tate v. Tate.

after his death his widow, who was old and illiterate, caused the will to be probated, and ignorantly claimed under it, and afterwards suggested the purchase of the interest of one of the daughters to a contemplating purchaser, she is not estopped to claim the land, nor to convey it to the other daughter, upon ascertaining that she was the sole owner of said land by survivorship, a fact of which she had been ignorant, especially when the purchaser was not influenced by her conduct, and he had equal, if not better, opportunity and chance to know the true title."

In the body of the opinion it is stated: "The contention for complainants may be thus formulated: They claim that the widow had her husband's will probated and claimed under it, and they bought in view of these facts, without objection from the widow, and that the widow and those under her are now estopped to set up a different title. It is answered that, while this is so, the old lady was in ignorance of her true title, and so were the other parties. By an amendment to the original bill, complainants go a step further, and charge that the widow requested and urged complainants to buy the land. Upon this feature of the case the court of chancery appeals reports that it is probable that the old lady did say something to Parkey about buying the land, but this is not stated as a fact, but that they did not buy because of any request from her, but upon their own belief that the title vested under the will of John Williams, and they thought that the title they were getting

was good, and the price reasonable. . . . Under these facts, the first question is: Was Mrs. Williams, the widow, estopped to claim under the joint deed to herself and husband after she was advised of her rights thereunder; and, if so, does such estoppel operate against her conveyee, Mrs. Ramsey? In *Morris* v. *Moore & Hancock*, 11 Humph., 433-435, it is said: 'To justify this principle of estoppel, it is material that the party shall be fully apprised of his rights, and shall by his conduct or gross negligence encourage or influence the purchaser; for, if he is wholly ignorant of his rights, or if the purchaser knows them, or if his acts or silence or negligence do not mislead or in any manner affect the transaction, there can be no just inference of actual or constructive fraud upon his part.' This principle is approved in a number of cases. We cite *Moses* v. *Sanford*, 2 Lea, 659; *Askins & Wife* v. *Coe*, 12 Lea, 672; *Collins* v. *Williams*, 98 Tenn., 525, 41 S. W., 1056; *Crabtree* v. *Bank*, 108 Tenn., 483, 67 S. W., 797; *Tenn. Coal Co.* v. *McDowell*, 100 Tenn., 570, 47 S. W., 153.

"In the case of *Crabtree* v. *Bank*, supra, the gist of the decision is that there will be no estoppel when there was a mutual mistake as to the effect of a court record to which the persons to be affected were parties, and that when the facts are known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel—citing quite a number of cases.

"Pomeroy says that, to make the doctrine applicable the party having the estate must knowingly mislead the party purchasing, or be guilty of deceit, or of such gross

Tate v. Tate.

negligence as to amount to evidence of intent to deceive. 2 Pom. Eq. Jur., section 807. To the same effect, see *Estis* v. *Jackson*, 111 N. C., 145, 16 S. E., 7, 32 Am. St. Rep., 784; *Holcomb* v. *Boynton*, 151 Ill., 294, 37 N. E., 1031; *Mills* v. *Graves*, 38 Ill., 455, 87 Am. Dec., 314; *Burgess* v. *Seligman*, 107 U. S., 20, 2 Sup. Ct., 10, 27 L. Ed., 359.

"Now, as found by the court of chancery appeals, the most that can be said is that an old, illiterate woman, in utter ignorance of her title in fee to the land, and believing that she had only a life estate in it, expressed a willingness or wish for complainants to buy the remainder interest, when they had ready access to the records showing the true title, and, having superior business experience and knowledge, could have formed a correct judgment as to her rights; and the court of chancery appeals finds that the evidence does not justify any inference that complainants relied upon any representations as to the title in the land made by Mrs. Williams, but they, with her, acted on the idea that the title vested under the will of her husband.

"Complainants concede the correctness of the law as laid down, but insist that the facts as found by the court of chancery appeals show an active inducement to complainants to buy, in that Mrs. Williams probated the will, claimed under it, and talked with the purchaser about the purchase, suggesting the purchase, and in that way inducing the purchase upon the idea that the title vested under the will.

"We are of opinion that the court of chancery appeals was correct in holding, notwithstanding these features, that Mrs. Williams and those claiming under her were ignorant of the true state of the title, and that complainants had equal, if not better, opportunity and chance to know the true title, and that the purchasers were not influenced by her statements or acts, and hence they are not estopped to set up the true title. We are of the opinion that under the facts stated by the court of chancery appeals, and the law as laid down in the cases, especially *Crabtree* v. *Bank,* 108 Tenn., 491, 67 S. W., 797, and cases there cited, the widow, upon learning, as a matter of fact, for the first time, of her true title, was not estopped to set it up by the fact that she had ignorantly claimed under the will, and had told complainant, in effect, that much."

The present case is far weaker in its grounds of estoppel than the one just cited. The construction which Mrs. Tate gave to her mother's will in the two chancery bills and in the deed was not made for the purpose of influencing the opinion of the creditors of her sister now complaining, or in any matter having relation to those parties. This construction was a mistaken one, but all other persons had equal means for passing judgment upon the correctness of that construction—that is, the will of record in the probate court. To hold an estoppel operative under such state of facts, and thereby take from Mrs. Tate her real estate, and bestow it upon the defendants, would, we think, be little short of an arbitrary transfer of title by the court.

It is insisted that the trust deeds which were executed by John T. Hillsman and his daughter, Mary T. Hillsman, for the security of the Morris loan, and for the security of the Clark loan, were made in execution of the power which was given in the will of Mrs. Hillsman for the sale of property to pay debts and for reinvestment. This position is untenable. An examination of the two trust deeds indicate, as we think beyond controversy, that these trust deeds were made upon the supposed one-half interest of Mary T. Hillsman in remainder, described therein, and the life estate of John T. Hillsman in the same property. It is true, Senator Turley, who it seems had been substituted for Judge B. M. Estes, joined in both of these trust deeds for the purpose of consenting thereto; but he expressly so limited his consent as to show that John T. and Mary T. Hillsman might convey their individual interest. That is not the language used, but it was in substance that.

However, there is one aspect of the matter under which we are of the opinion that complainant must be required to pay at least a portion of the debt secured in the two trust deeds last stated. It appears from the facts already stated that all of the Morris loan was used to pay off the Frayser loan, and that $2,000 of the Clark loan was used to repay that much of the Morris loan, and that at least $4,000 of the Frayser loan was used to redeem the land from Nealis, who had purchased it under a tax sale. We think it clear that if the Frayser loan were now in question—that is, if complainant

were seeking to have that trust deed canceled as a cloud upon her title—she would be compelled in equity to repay so much of that loan as was used in removing the tax burden. It is equally beyond doubt that if, instead of lending to John T. Hillsman and Mary T. Hillsman $4,000 under a new trust deed, Morris, guardian, had purchased that much of the trust debt secured by the Frayser trust deed, the same right would exist in his favor, under the principles declared in *Trousdale* v. *Maxwell*, 6 Lea, 161; *Caldwell* v. *Palmer*, 6 Lea, 652, and *Howard* v. *Wheatley*, 15 Lea, 607, 616. In these cases subsequent purchasers from the original vendee were permitted to enforce the equities. In the present case the legal forms in which the parties are related to each other are different, but the substance is the same. On the same principle the Clark beneficiaries, under the Clark trust deed, must be repaid the $2,000, the sum which was applied on the Morris trust deed. The balance due on the Morris trust deed, with interest from the filing of the original bill in the present case, will be declared a charge upon the land of the complainants involved in the present controversy; likewise $2,000 in favor of the beneficiaries under the Clark trust deed, also with interest from the filing of the original bill.

It is insisted in behalf of the complainants that this relief ought not to be granted because the equity is too attenuated; that is to say, if the relief can be granted two or three removes from the original transaction, it may be granted indefinitely. It does not follow. It ought to be granted only so far as the court can clearly

see the equity exists. When that can be clearly and satisfactorily ascertained, we do not think that the number of intermediate transactions composing the links in the chain should be regarded as a matter of importance.

It is also insisted in behalf of complainant that she settled this matter with her sister under the deed of June 20, 1902, the substance of which we have already set out. It does not appear what the value of that lot was. All that we have before us is that it was subsequently sold to Barksdale, for $2,000, and of this sum $500 was used in repairs upon complainant's property, and $500, with interest—that is, $597—was paid to complainant Mrs. Tate herself, or to her husband for her. It does not clearly appear, but we infer that the remaining $1,800 of it was appropriated by complainant's father, as due his life estate. What that was worth we do not know. However, from these facts there is not much basis of equity on which complainant can claim release from the obligations which we think are justly imposed upon her, in behalf of the persons the benefit of whose means she has enjoyed.

From what has been said in this opinion, it is apparent that nothing passed under the will of Mary T. Hillsman.

A decree will be entered here settling the rights of the parties on the basis indicated in this opinion, and allowing complainants ninety days in which to pay the sums of money which we have held should be paid to Morris, guardian, and to the Clark heirs.

The costs of this court and the court below will be paid, one-half by complainants, one-fourth by Morris, guardian, and one-fourth by the Clark heirs.